# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARTHA TURNER,            )
                              )   **No. 12 CV 10229**
            **Plaintiff,**  )
                              )
v.                     )   **Magistrate Judge Young B. Kim**
                              )
CAROLYN W. COLVIN, Acting  )
Commissioner, Social Security  )
Administration,[1]          )
                              )   **July 22, 2014**
            **Defendant.**  )

## MEMORANDUM OPINION and ORDER

Martha Turner seeks disability insurance benefits ("DIB"), *see* 42 U.S.C. §§ 416(i), 423, and supplemental security income ("SSI"), *id.* §§ 1381, *et seq.*, claiming that she is disabled as a result of degenerative disc disease. After the Commissioner of the Social Security Administration denied her applications, Turner filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Turner's motion is granted to the extent that the case is remanded for further proceedings and the Commissioner's motion is denied:

### Procedural History

Turner first applied for DIB and SSI on December 12, 2007, claiming she was disabled as of September 8, 2007, because of a back injury "resulting from being hit

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

by a large object." (See Administrative Record ("A.R.") 83, 86.) After the Commissioner denied her claims initially and upon reconsideration, Turner sought and was granted a hearing before an administrative law judge ("ALJ"). (Id. at 83.) On September 8, 2009, ALJ Mona Ahmed issued a decision concluding that Turner was not disabled.[2] (Id. at 83-91.)

Turner applied again for DIB and SSI three months later on December 7, 2009, claiming the same disability onset date of September 8, 2007. (Id. at 39, 41.) This second application was also denied initially and upon reconsideration, (id. at 76, 78), and Turner sought and was granted a hearing before another ALJ, (id. at 126, 151). ALJ Curt Marceille held a hearing on May 9, 2011, at which Turner and a vocational expert provided testimony. (Id. at 55.) On May 26, 2011, ALJ Marceille issued a decision finding that Turner is not disabled within the meaning of the Social Security Act and denying her DIB and SSI claims. (Id. at 39-49.) When the Appeals Council denied Turner's request for review on July 31, 2012, (id. at 3-8), the ALJ's denial of benefits became the final decision of the Commissioner, see *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). On December 21, 2012, Turner filed the current suit seeking judicial review of the Commissioner's second decision. *See* 42 U.S.C. § 405(g); (R. 1, Compl.). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c); (R. 9).

---

[2] The Appeals Council denied Turner's request for review on August 19, 2010. (A.R. 97-101).

## Facts

Turner, who is 51 years old, has had back pain since a September 2007 injury. Turner also suffers from chronic anemia. She has worked various retail jobs, and her last job was as an assistant manager at her sister's popcorn store from May 2006 through July 2009. Despite this work record, she claims that her back pain became disabling on September 8, 2007. Turner presented both documentary and testimonial evidence in support of her claim.

### A.      Medical Evidence

In September 2007, Turner sought emergency care after an accident involving heavy juice cartons either falling on or striking her back while she stood in line at a store (the specifics of the incident are not clearly described in the record). (A.R. 544.) An MRI showed "degenerative disc disease at L5-S1" and "[l]oss of normal lumbar lordosis." (Id.) Shortly thereafter Turner began seeing chiropractors at Chicago Heights Pain Center. (Id. at 308.) She went for weekly visits from mid-September 2007 through January 2008. (See id. at 313-36.) During that time Turner generally reported experiencing "a lot of pain," mostly at night, but with occasional improvement using moist heat therapy, electrical muscle stimulation, and home exercises. (See, e.g., id. at 313, 315, 334.)

In January 2008, Turner was referred to Dr. Paul Madison, a pain management specialist. (Id. at 339.) When Turner first saw Dr. Madison, she told him that sharp pain caused her to sleep only two to three hours a night. (Id.) Dr. Madison prescribed Norco and Flexeril, and also performed a lumbar spine MRI

which confirmed L5-S1 disc herniation, disc bulging at L4-L5 and L3-L4, and lumbar radiculopathy. (Id. at 339, 341.) Later that month Dr. Madison administered a transforaminal epidural steroid injection and diagnosed Turner with disc protrusion and lumbar neuralgia. (Id. at 342.) Turner reported that the epidural injection reduced, but did not eliminate, her pain. (Id. at 336.)

In April 2008, Dr. Madison noted that while Turner experienced some improvement in her symptoms, she continued to experience severe pain "despite conservative treatment including medication, therapy, and steroid injections." (Id. at 348.) A physical examination showed a positive straight leg test, and Dr. Madison observed that Turner's ambulation was slightly slowed and she had a "crouched forward" posture. (Id.) He recommended a lumbar disc nucleoplasty[3] of L4-L5 and L5-S1. (Id. at 349.) He also noted that Turner was going to discontinue taking Norco because of dizziness associated with the medication. (Id.)

During that April 2008 visit, Dr. Madison also completed a form for the Illinois Bureau of Disability Determination Services ("DDS"). (Id. at 512-13.) He diagnosed Turner with herniated discs at L4-L5 and L5-S1, lumbar neuralgia, and bilateral lumbar radiculitis. (Id. at 512.) He wrote that Turner complained of numbness in her legs and pain and weakness in both her low back and legs caused by standing or sitting for more than 20 minutes, bending forward, and lifting more

---

[3]    Also called a "percutaneous discectomy," this surgical procedure involves removing herniated disc material that is pressing on a nerve root or spinal cord. (See A.R. 349); *Percutaneous Discectomy for a Lumbar Herniated Disc*, WebMD.com, http://www.webmd.com/back-pain/percutaneous-discectomy-for-a-herniated-disc (last visited July 21, 2014).

than 10 pounds. (Id.) He also reported that straight leg raise tests showed evidence of nerve root compression. (Id.) Dr. Madison noted her lumbar spine range of motion was 70 degrees forward and 20 degrees lateral, and described her gait as "slowed" with no assistive device needed. (Id.) He opined that she can only sit or stand for 20 to 30 minute stretches, and then must alternate positions. (Id. at 513.)

Later that April, Dr. Madison performed a nucleoplasty on Turner. (Id. at 379.) In a letter summarizing a follow-up visit, Dr. Madison wrote that Turner sits and moves very slowly and has difficulty standing or walking for an extended period of time. (Id. at 386.) He observed that after being seated for more than 20 minutes, Turner appeared to have significant difficulty standing. (Id.) He added that she exhibited "weakness of dorsiflexion and plantarflexion," reported mild loss of sensation in her thighs, and had stopped taking Norco due to itchiness. (Id.)

In May 2008, Dr. Madison completed a medical evaluation for the Illinois Department of Human Services ("DHS"). (Id. at 362-63, 365, 374, 386.) He opined that she had "more than 50% reduced capacity" in walking, bending, standing, stooping, climbing, pushing, and pulling during an eight-hour workday. (Id. at 362.) He further found she had 20 to 50 percent reduced capacity for sitting, turning, and performing activities of daily living. (Id.) He observed that she had tenderness, weakness, and mobility limitations of her lumbar spine and lower extremities. (Id. at 363.) He also noted mild sensory loss in her thighs, radicular symptoms, weakness of dorsiflexion and plantarflexion, herniated discs, and muscle spasms. (Id.)

Turner went to the emergency room in June 2008 for swelling in her left ankle. (Id. at 539.) An examination showed no back tenderness, no pain with a straight leg raise test, mild swelling and tenderness in her left foot, and steady ambulation without assistance. (Id. at 540.) Turner was diagnosed with acute non-traumatic swelling of the left ankle and prescribed anti-inflammatory medication. (Id.)

In July 2008, Turner received another epidural steroid injection and Dr. Madison diagnosed her with cervical neuralgia. (Id. at 353.) For about a year afterwards, the record shows no treatment or visits aside from prescription refills. (See id. at 481.) Then in July 2009, Turner went to the emergency room complaining of back pain. (Id. at 522.) She was diagnosed with a herniated disc and sciatica and discharged with medication prescriptions for her pain. (Id. at 523, 525.)

In October 2009, Turner went to the emergency room again for back pain and reported that although she had been taking Vicodin and Flexeril, she ran out of Flexeril several days earlier and had not been taking Vicodin regularly. (Id. at 517.) She also complained of fatigue and said she had not seen a doctor since her surgery the year before. (Id.) A physical exam showed lumbar tenderness, but straight leg raise results were negative and she had "normal range of motion." (Id. at 518.) She was discharged with muscle relaxants and pain medications. (Id.)

Later that month Turner began seeing Dr. Rachel Rubin at Oak Forest Hospital for her lower back pain. (Id. at 548.) Dr. Rubin noted negative straight leg

raise results and recommended that Turner continue taking her prescribed medication. (Id.) During a follow-up visit in February 2010, Dr. Rubin reported that Turner went to the emergency room a few days earlier for back pain and a swollen left foot that was "better now." (Id. at 556.) She wrote that Turner had a positive left straight leg raise and "cannot stand or walk for [more than] 10 minutes at a time." (Id.)

In March 2010, Dr. M.S. Patil completed an internal medicine consultative examination for DDS. (Id. at 563.) Turner told Dr. Patil she was receiving physical therapy "on and off," and had been "doing well" until October 2009. (Id.) She complained of constant low back pain radiating to her legs, as well as intermittent numbness and swelling in her feet. (Id.) During the physical examination, Turner had a normal gait and did not need an assistive device to stand, but she had some difficulty walking on her heels and toes. (Id. at 565.) Dr. Patil noted that Turner had range of motion limitations in her lumbar spine and some difficulty squatting and arising. (Id.) His diagnostic impressions from x-ray imaging included severe disc space narrowing of the L5-S1 intervertebral disc space with sclerosis of the lower half of the L5 vertebral body. (Id.)

In April 2010, Dr. David Mack, a medical consultant, completed a Physical Residual Functional Capacity ("RFC") Assessment. (Id. at 568-75.) He opined that Turner could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk six hours a day, sit for six hours a day, and perform unlimited pushing and pulling. (Id. at 569.) Dr. Mack referenced Dr. Patil's examination showing Turner's

ambulation, strength, reflexes, and sensation were normal. (Id.) Dr. Mack concluded that she could occasionally climb ramps and stairs and stoop, but could never climb ladders, ropes, or scaffolds. (Id. at 570.) He reported no manipulative, visual, communicative, or environmental limitations. (Id. at 571-72.) He believed Turner's statements were "partially credible" because she "indicates severe restrictions due to pain yet ambulation is normal." (Id. at 536.)

Then in May 2010, Dr. Calixto Aquino completed an Illinois Request for Medical Advice form affirming Dr. Mack's Physical RFC Assessment. (Id. at 588-90.) In addition to summarizing Dr. Patil's examination findings, Dr. Aquino referred to a May 2010 record from Dr. Rubin indicating chronic low back pain with sciatica caused by a herniated disc. (Id. at 590.) He noted that Dr. Rubin recorded a positive straight leg raise test, and that it appeared Turner could still lift 20 pounds occasionally and 10 pounds frequently. (Id.) Dr. Aquino concluded that Turner's complaint of having problems sleeping because of pain was credible, but that overall, her claims were still only "partially credible" and that "objective medical evidence" did not support the severity of her statements. (Id.) Although Dr. Aquino did not mention this in his report, Dr. Rubin's May 2010 record also stated that Turner could not work an eight-hour day "in either a seated job or standing." (Id. at 579.)

In August 2010, Turner went back to see Dr. Rubin and reported lower back pain and numbness in her left toes, for which Dr. Rubin prescribed medication. (Id. at 592.) In September 2010, lumbosacral spine radiographs showed "severe

intravertebral disc space narrowing at L5/S1" and "facet joint degenerative changes." (Id. at 638.) Turner was referred for physical therapy ("PT") at Oak Forest Hospital, and physical therapist Daniel Halkin noted that Turner complained of severe back pain, sharp pain shooting through her left ankle, aching knees, chest pain, and pain while sitting. (Id. at 628.) Turner also reported "decreased sensation" in her left lower extremity. (Id.) Halkin wrote that Turner demonstrated generalized pain symptoms and would require PT intervention. (Id. at 630.) Her proposed treatment plan included outpatient PT twice a week in October, but there are no records documenting that Turner attended these sessions. (Id. at 603, 630.)

## B.  Turner's Testimony

During the hearing in May 2011, Turner described her past work history. (A.R. 58-59.) She testified that she previously worked at a shoe store and more recently worked at her sister's popcorn shop as an assistant manager. (Id.) Her responsibilities there included unpacking shipments, ordering, scheduling, and stocking. (Id. at 59.) She said she started working at the popcorn shop in May 2006, but stopped working there in July 2009 because the store went out of business. (Id.) According to her testimony, Turner worked there five days a week. (Id.)

Turner then testified about the limiting effects of her degenerative disc disease. She said her pain radiates from her back down to her legs. (Id. at 60.) Turner rated her pain on a scale from one to ten as "about a ten," indicating

emergency room-level pain. (Id.) When asked how often she goes to the emergency room because of pain, Turner testified that she had been going "for the past months" and went "three weeks ago." (Id.) She then added that she had been in the emergency room every other week because of bleeding, and afterwards clarified that her visits were for pain as well "because it's all one." (Id.)

As for treatment, Turner testified that she takes medication for her pain. (Id. at 60-61.) She said Vicodin makes her itch and Norco causes her left side to swell, but switching to Tramadol and Prednisone has helped. (Id. at 61.) According to Turner, she wakes up to take her pain medications two or three times a night, and her medications also make her so tired that she often sleeps for six or seven hours during the day. (Id. at 62, 66.) When asked whether her pain had worsened since she first applied for benefits, Turner responded that her pain is "a lot worse" in the sense that it is more constant than it was two years ago. (Id. at 64.) She also said that she went to PT about four months before the hearing. (Id.) She explained that she stopped seeing Dr. Madison because she could no longer afford to pay him, so she sought treatment from Cook County instead. (Id. at 66.)

With respect to daily activities, Turner testified that during a typical day, she stays inside her mother's house where she lives with her two sisters. (Id. at 62.) She does not cook or clean and spends most of her time resting because she does not sleep well at night. (Id. at 63.) She goes to the grocery store with her sister sometimes to get some air, but she sits in the car while her sister goes into the store. (Id. at 63-64.) Turner said she does not drive because of her pain and no

longer has a valid driver's license. (Id. at 68.) She also mentioned that she got "some toll tickets." (Id.) She said she used to go to church every Sunday but stopped going because of fatigue and has trouble standing or sitting for long stretches of time. (Id. at 66.) She testified that she can lift about 10 pounds, sit for 30 to 40 minutes before she has to get up and move around, and stand for about 30 to 40 minutes. (Id. at 63.) She explained that she can also walk for about 30 minutes. (Id.)

## C.    Vocational Expert's Testimony

Vocational Expert ("VE") Lee Knutson answered the ALJ's questions regarding the kinds of jobs someone with certain hypothetical limitations could perform. (A.R. 69-74.) The VE first confirmed that Turner's previous job as an assistant manager at various retail stores is a light and skilled position which she performed at a medium level of exertion. (Id. at 69.) The VE noted that Turner also previously held a position as a sales clerk, which is a light and semi-skilled position. (Id. at 70.) The ALJ then asked the VE about a hypothetical individual of Turner's age, education, and work experience who was limited to sedentary work and could lift 10 pounds occasionally, less than 10 pounds frequently, sit for six of eight hours, and stand and walk for a total of two hours in an eight-hour workday. (Id.) This hypothetical individual could not climb ladders, ropes, or scaffolds, and could not work around unprotected heights or hazards because of "drowsiness, side effects, [and] sleep problems." (Id.) The VE responded that such an individual would not

be able to work at Turner's previous jobs, but could work as a bench assembler, inspector, checker, order clerk, or weigher.[4]  (Id. at 70-71.)

The ALJ next asked about an individual with the same limitations from the first hypothetical, but added that after 30 minutes of sitting, the individual would need to stand up for a period of time before returning to her seat.  (Id.)  The VE testified that these additional limitations would probably reduce the number of available bench assembler, inspector, checker, and weigher positions by at least 30 percent, but that the limitations would not impact the order clerk position.  (Id. at 71.)

Then Turner's attorney asked the VE about an individual with the same limitations as the ALJ's second hypothetical, except that after sitting for 30 or 40 minutes, she would need to stand up and walk around for 10 or 15 minutes repeatedly throughout the workday.  (Id. at 72.)  The VE responded that if such an individual had to leave her work area or station to walk around, she would not be able to perform any of the above-mentioned positions and there would be no other unskilled sedentary positions available.  (Id.)  Turner's attorney then asked about a hypothetical individual who would be off-task because of drowsiness or any other reason for more than 15 percent of the workday.  (Id.)  The VE testified that such an individual would also be unemployable.  (Id. at 72-73.)

---

[4]  The hearing transcript refers to "waiters" and "wait tester" positions.  (Id. at 71.) However, the court presumes that the transcript should read "weighers" and "weight tester" instead because the VE cited to Dictionary of Occupational Titles § 539.485-010, the entry for "weight tester," as an example of an available job.  *See* Dep't of Labor, Dictionary of Occupational Titles (4th ed. Rev. 1991), DICOT § 539.485-010, *available at* http://www.occupationalinfo.org/53/539485010.html.

**D.      Post-Decision Medical Evidence**

After the ALJ issued his decision denying benefits on May 26, 2011, Turner submitted two additional records from Dr. Rubin which the Appeals Council considered when it denied Turner's request for review on July 31, 2012.  (A.R. 3-6.) One of the records was an October 2011 report noting that Turner complained of low back pain, anemia, hot flashes, and numbness in her feet and toes.  (Id. at 634.) Dr. Rubin diagnosed Turner with cervicalgia, low back pain, and iron deficiency anemia.  (Id. at 636.)  She wrote that because of her ailments, Turner cannot sit or stand for long periods of time and needs to rest 10 minutes out of each hour.  (Id. at 637.)  Dr. Rubin concluded that Turner cannot lift, bend, climb, twist, or stoop.  (Id.) She further opined that PT was not helping, and that Turner cannot tolerate sedentary work due to chronic fatigue and the need to change positions frequently. (Id.)

Turner also submitted a Physical Impairment Questionnaire Dr. Rubin completed in February 2012.  (Id. at 686.)  In that report, Dr. Rubin wrote that Turner can lift five or fewer pounds and can only use her left and right arms, hands, and fingers for 20 percent of an eight-hour workday.  (Id.)  She opined that Turner does not need an assistive device, but cannot sit, stand, or walk for more than an hour.  (Id.)  Dr. Rubin concluded that as a result of her impairments, Turner would likely miss three or more days of work per month.  (Id.)

## E.    The ALJ's Decision

The ALJ concluded that Turner is not disabled under §§ 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.  (A.R. 39-40.)  The ALJ first noted that the doctrine of res judicata applies for the period between Turner's alleged disability onset date, September 8, 2007, and September 8, 2009, because of the Commissioner's previous binding decision denying benefits.  (Id. at 39.)  The ALJ therefore limited his decision to determining disability beginning on September 8, 2009.  (Id.)

In applying the standard five-step sequence for assessing disability, *see Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012), the ALJ determined at steps one and two of the analysis that Turner has not engaged in substantial gainful activity since September 9, 2009, and that her degenerative disc disease constitutes a severe impairment.  (A.R. 41.)  At step three the ALJ found that Turner's impairment neither meets nor medically equals any of the listings in 20 C.F.R. 404, Subpart P, Appendix 1.  (Id. at 42.)  Proceeding to steps four and five of the analysis, the ALJ concluded that Turner has the RFC to perform less than the full range of sedentary work.  (Id.)  He found that Turner can stand and walk for short periods of time for a total of two hours in an eight-hour workday, can sit for six hours a day, cannot crouch, crawl, kneel, or climb ladders, ropes, or scaffolds, can only occasionally stoop and climb ramps and stairs, and must avoid unprotected heights or hazards such as dangerous moving machinery.  (Id.)  The ALJ further found that Turner is unable to return to her previous work, but that she can

perform other jobs that exist in the national economy. (Id. at 47-48.) Accordingly, the ALJ concluded that Turner is not disabled and denied her applications for benefits.

## Analysis

In her motion for summary judgment, Turner argues that the ALJ committed reversible errors in determining her RFC, assessing her credibility, weighing the medical evidence, and analyzing whether her impairment meets or medically equals Listing 1.04. (R. 20, Pl.'s Mem.) This court's role in disability cases is limited to determining whether the ALJ's decision is supported by substantial evidence and free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and his conclusion, but not necessarily to provide a comprehensive written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has adequate support, this court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

### A. Step-Three Analysis

This court begins with Turner's argument that the ALJ improperly evaluated whether her condition meets Listing 1.04 because a claimant with a qualifying

impairment is presumed to be disabled, ending the need for further inquiry. *See Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). To fall under a listed impairment the claimant must demonstrate that she satisfies all of the listing's criteria. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). A claimant's condition meets or equals Listing 1.04(A) if it is a disorder of the spine resulting in compromise of a nerve root, and there is evidence of "nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test[.]" *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. Listings 1.04(B) and 1.04(C), which Turner does not contend apply to her, require "spinal arachnoiditis" and "lumbar spinal stenosis" respectively, along with evidence related to those conditions. *Id.* The parties do not dispute that Turner's degenerative disc disease is a qualifying spine disorder, and the ALJ found that Turner's disorder constitutes a severe impairment. (See A.R. 41.) But the ALJ determined that Turner did not meet the additional requirements in Listing 1.04(A) for a finding of presumptive disability. (Id. at 42.)

Turner argues that the ALJ misinterpreted Listing 1.04 and failed to recognize evidence in the record indicating nerve root compression. (R. 20, Pl.'s Mem. at 19.) Although ALJs need not address every piece of evidence when considering whether a claimant's condition meets or equals a listed impairment, an ALJ must offer more than a perfunctory analysis of the listing. *Kastner*, 697 F.3d at

647 (citations omitted). If a decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," remand is required. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Here the ALJ provided little explanation for his conclusion beyond stating that the record did not document "nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis." (A.R. 42.) A conclusory statement that a severe impairment does not meet or equal a listing cannot substitute for a meaningful discussion of all the relevant medical evidence. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006).

The ALJ did, however, make reference to "objective medical evidence" discussed elsewhere in the opinion, and it is proper for this court to consider the ALJ's decision as a whole in deciding whether the listing decision has sufficient support. *See Rice*, 384 F.3d at 370 & n.5. Looking to the ALJ's discussion of Turner's credibility, the ALJ concluded that "[a]lthough there was medical evidence of limited spine range of motion and positive straight leg raise, there was no documented motor, sensory, or reflex loss." (A.R. 44.) However, the ALJ appears to have disregarded records showing that Turner exhibited or at least reported motor loss and sensory loss. The listings note that "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(E)(1); *see also Kastner*, 697 F.3d at 650. Dr. Patil observed in his March 2010 consultative examination that Turner had difficulty walking on her heels and toes and squatting and arising. (Id. at 563.) Dr. Patil also reported that Turner complained of

intermittent numbness in her feet.  (See id.)  Turner reported numbness in her toes during an August 2010 visit with Dr. Rubin, (id. at 592), and decreased sensation in her lower left extremity during a September 2010 PT evaluation, (id. at 628).  It is unclear from his decision whether the ALJ considered this relevant evidence.  Because the ALJ did not articulate a rationale for finding "no documented motor, sensory, or reflex loss" despite records indicating otherwise, remand is necessary for a more thorough analysis of the evidence.  (Id. at 44.)

Turner also argues the ALJ should have consulted a medical expert before concluding that her impairment did not equal Listing 1.04.  (R. 20, Pl.'s Mem. at 20.)  Social Security rulings instruct ALJs that they are responsible "for deciding the ultimate legal question of whether a listing is met or equaled."  S.S.R. 96-6p, 1996 WL 374180, at *3.  The rulings also note, however, that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence . . . must be received into the record as expert opinion evidence and given appropriate weight."  *Id.*  The ALJ may rely solely on opinions given in disability determination forms and provide little additional explanation, but he can only do so if there is no contradictory evidence in the record.  *See Ribaudo*, 458 F.3d at 584.

Here it appears that the consulting physicians did not specifically opine on medical equivalence to any listings, and the record contains none of the requisite forms that would otherwise address the issue of equivalency.  *See Maziarka v. Colvin,* 983 F. Supp. 2d 991, 1004 (N.D. Ill. 2013).  Although Dr. Patil noted at the

time of the examination that Turner's extremity strength, reflexes, and sensation were normal, the ALJ made no reference to those findings and could not have relied solely on those opinions, without further explanation, given contradictory evidence in the record.  Furthermore, the fact that Dr. Patil did not find sensory loss during the examination is not necessarily inconsistent with Turner's complaints of intermittent numbness.  Perhaps the ALJ discounted Turner's self-reports of sensory loss or Dr. Patil's observations of motor loss for credibility reasons.  If so, the ALJ should explain that determination on remand.  The ALJ should also consider whether a medical expert might assist in determining whether Turner's spinal disorder medically meets or equals the requirements in Listing 1.04.

## B.    RFC Assessment

Although the court need not address in detail Turner's remaining challenges because remand is necessary on the basis of the ALJ's listing analysis, the court will address them in the interest of thoroughness.

### 1.    Medical Opinions

Turner argues that the ALJ improperly discounted the opinions of Drs. Madison and Rubin.  (R. 20, Pl.'s Mem. at 12-18.)  As treating sources, their opinions are entitled to controlling weight as long as they are supported by medical findings and consistent with substantial evidence in the record.   20 C.F.R. § 404.1527(c)(2); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).  However, an ALJ "may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating

physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Schreiber v. Colvin*, 519 Fed. Appx. 951, 958 (7th Cir. 2013) (internal quotations and citation omitted).

The ALJ discounted Dr. Madison's May 2008 opinion because it was "inconsistent with the claimant's minimal clinical findings." (A.R. 46.) The ALJ referred to an MRI which showed a herniated disc, but "no stenosis or significant neuroforaminal narrowing[.]" (Id.) He also found that Dr. Madison's opinion regarding Turner's reduced capacity for certain activities was "vague," and then cited generally to reasons "indicated in the prior [ALJ's] decision" for concluding that Dr. Madison's opinion deserved "little weight." (Id.)

This court finds that the ALJ's explanation falls short for a few reasons. First, it is unclear how the ALJ reached the conclusion that "no stenosis or significant neuroforaminal narrowing" in Turner's MRI results meant Dr. Madison's opinion was unsupported. The ALJ's inference that a herniated disc alone could not cause the limitations documented in Dr. Madison's opinion constitutes an independent and unqualified medical determination. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). The absence of medical evidence supporting the ALJ's inference indicates that he impermissibly "played doctor" and filled an evidentiary gap using his own lay opinion. *See Myles*, 582 F.3d at 677. On remand the ALJ should build the requisite logical bridge between the evidence he cited and his conclusion that Dr. Madison's opinion was inconsistent with the medical evidence.

Second, the ALJ disregarded Dr. Madison's findings as "vague," but ironically, it is unclear what the ALJ meant by that characterization. The court presumes he was referring to the reasons "indicated in the prior [ALJ's] decision" for giving Dr. Madison's opinion little weight. (A.R. 46.) In her September 2009 decision, ALJ Ahmed characterized Dr. Madison's assessments of Turner's capacity for physical activities as "vague and not particularly helpful" because the percent-ranges in the evaluation form were imprecise and "could have a number of interpretations." (Id. at 88.)

Besides the fact that any imprecision is attributable to the DHS form itself, (see id. at 362), as a treating source, Dr. Madison's opinions are still entitled to controlling weight if they are supported by medical findings and consistent with substantial evidence in the record, *see* 20 C.F.R. § 404.1527(c)(2). Notwithstanding Dr. Madison's "vague" assessments, ALJ Ahmed concluded that to the extent Dr. Madison intended to report that Turner could not do even sedentary work, his opinions were unsupported because they indicated "some tenderness, lack of mobility and 'mild' abnormalities." (A.R. 88.) Not only did she over-simplify Dr. Madison's notes, ALJ Ahmed also failed to explain how these findings meant his opinions were unsupported or inconsistent with the rest of the record. The court is left only with ALJ Ahmed's unexplained reliance on the MRI results showing "no stenosis or narrowing," which is insufficient for reasons already discussed. (See id.)

Finally, there is no indication in either the current or previous decision that the ALJ considered the length, nature, and extent of Turner's treatment

relationship with Dr. Madison, the frequency of examination, Dr. Madison's specialty, or the types of tests he performed, as required by 20 C.F.R. § 404.1527(c)(2). The record shows that Dr. Madison, a pain specialist, treated Turner for several months beginning in January 2008 and saw her on numerous occasions during that time. (See, e.g., A.R. 339, 342, 348, 363, 366, 379, 386, 455, 512.) He performed a variety of tests and procedures on Turner, including an MRI, (id. at 360), epidural steroid injections, (id. at 342, 353, 455), and a lumbar nucleoplasty, (id. at 379).

Given the deficiencies in the ALJ's reasoning, the ALJ should elaborate on his conclusions and apply the correct legal standard on remand. Although he may still conclude that Dr. Madison's findings should be given little weight, if the ALJ does decide to afford more weight to Dr. Madison's opinions, the ALJ should also consider how those opinions might affect his analysis of Listing 1.04.

The ALJ's explanation for why he gave little weight to Dr. Rubin's opinions fares better, but certain deficiencies in the ALJ's rationale should be addressed on remand. The ALJ correctly noted that Dr. Rubin's statements that Turner is "disabled" or "unable to work" are findings reserved for the Commissioner, who has the ultimate responsibility for determining disability. *See* 20 CFR §§ 404.1527(d)(2), 416.927(d)(2). The ALJ then explained why he believed the record did not support Dr. Rubin's conclusions. (A.R. 46.) In October 2009, Dr. Rubin reported that Turner had some tenderness and tight musculature and complained of back pain, but her straight leg raise results were negative. (Id. at 46,

516.)  Dr. Rubin's subsequent treatment notes documented roughly the same symptoms from that initial visit, (id. at 528, 548, 556, 579), except that in February 2010 she had a positive straight leg raise, (id. at 556), and in August 2010 Turner complained of numbness in her left toes, (id. at 592).  While the ALJ was mistaken to conclude there was no indication of any sensory loss in the record, he was otherwise correct in observing that Dr. Rubin's findings were generally limited to reports of pain and tenderness.  (Id. at 46.)  Furthermore, the ALJ pointed out that in March 2011, Dr. Rubin's notes showed "normal strength, no swelling, and normal gait."  (Id. at 45, 620.)  Accordingly, the ALJ had sufficient grounds to find that Dr. Rubin's treatment notes did not provide sufficient support for her conclusion that Turner was totally disabled.

The ALJ also found that Dr. Rubin provided infrequent and "minimal" treatment to Turner which was inconsistent with the limitations she suggested. (Id. at 46.)  He noted that Dr. Rubin saw Turner in October 2009, and the record shows a follow-up visit in November 2009, but subsequently Dr. Rubin only saw Turner about once every three months.  (Id. at 46, 528, 548, 556, 579, 592, 619.) Moreover, when Dr. Rubin opined that Turner could not work an eight-hour day in either a seated or standing position, she had only seen Turner a few times.  (Id. at 46, 579.)  Accordingly, the ALJ had a basis for relying on the limited nature, frequency, and extent of Dr. Rubin's treatment history to discount her conclusion that Turner cannot do even sedentary work.

The ALJ did err, however, in finding that Dr. Rubin based her opinions largely on Turner's subjective complaints. Although an ALJ is entitled to discount a treating physician's opinion when it simply parrots the claimant's subjective complaints, see *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008), here Dr. Rubin's notes reflect that she physically examined Turner and observed tightness and tenderness in her lower back. (A.R. 548.) In the course of their treating relationship Dr. Rubin prescribed Turner narcotics (including Norco and Vicodin) and reviewed her lumbosacral spine radiographs. (See id. at 593, 638.) In addition to Turner's self-reports of pain, Dr. Rubin's notes include references to Turner's diagnosed conditions, including sciatica, disc space narrowing, and herniated discs. (Id. at 556, 579.) Thus the record does not support the ALJ's assertion that Dr. Rubin based her opinions largely on Turner's subjective complaints.

The ALJ further erred in discounting Dr. Rubin's opinion because she only treated Turner with pain medications. (Id. at 46.) Although in some cases conservative treatment may contradict the severity of the limitations alleged, here the ALJ did not explain why Dr. Rubin's decision to treat Turner's back pain with medication constituted conservative treatment. *See Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) (contrasting "conservative" treatment like over-the-counter medication with "more aggressive" treatment like prescription narcotics and steroid injections). Dr. Rubin prescribed Turner a plethora of pain medications. (See A.R. 593.) The record shows that despite undergoing more aggressive treatments such

as steroid injections and nucleoplasty, Turner continued to complain of pain. (See id. at 379, 628.) Because the court is remanding for a further discussion of the ALJ's listing determination, the ALJ should take the opportunity to address these other areas of concern in his analysis.

The ALJ correctly noted that Dr. Patil's March 2010 physical examination found no neurological deficits and a normal gait. (Id. at 45, 565.) In April 2010, Dr. Mack observed that Turner's ambulation, strength, reflexes, and sensation were normal, and that she could stand or walk for six hours a day. (Id. at 568, 569.) Dr. Aquino's May 2010 report affirmed Dr. Mack's opinion. (Id. at 588.) But the ALJ's discussion of these opinions is incomplete without proper analysis of what weight to give the opinions of Drs. Madison and Rubin. Accordingly, the court finds that there is insufficient evidence in the record to support the ALJ's assessment that Turner is capable of sedentary work.[5]

### 2. Side Effects of Medications

Turner also argues that the ALJ failed to account for the side effects of Turner's medication. (R. 20, Pl.'s Mem. at 7.) Turner does not dispute that the ALJ accommodated her medication's itching and fatigue side effects by limiting her to

---

[5] Turner relies heavily on Dr. Rubin's post-decision opinions in contending that the ALJ erred in finding her capable of sedentary work. (See R. 20, Pl.'s Mem. at 9.) But absent the requisite showings under 42 U.S.C. § 405(g), which Turner made no attempt to make, the court cannot review Dr. Rubin's post-decision opinions in deciding whether the ALJ's reasoning was supported by the record as a whole. *See* 42 U.S.C. § 405(g) (requiring that claimant show additional evidence is new and material, and "that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding"); *Eads v. Sec'y of the Dept. of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993).

sedentary work involving no exposure to hazards. (Id.) She contends, however, that he failed to consider forgetfulness, swelling, and severe drowsiness caused by her medications. (Id.) She notes that swelling is a side effect of Norco, trouble concentrating and drowsiness are side effects of Flexeril, and that Turner complained of all three symptoms. (Id. at 8.)

While it is true that an ALJ is required to consider the side effects of medication when there is evidence that they cause significant symptoms, *see Binion v. Shalala*, 13 F.3d 243, 247 (7th Cir. 1994), here the record does not indicate that any alleged forgetfulness or swelling interferes with her daily activities or her ability to work. Nor has Turner pointed to evidence showing that these side effects contribute to the effects of her other symptoms. It is Turner's burden to establish the severity of her symptoms, *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), but as the ALJ pointed out, there is "little indication in the medical records of [Turner] being forgetful because of medication" or of "any significant problems with swelling[] due to use of Norco . . . ." (A.R. 44-45.) Although the record shows that Turner complained of occasional swelling in her feet, she does not point to any doctor's reports stating that the swelling is functionally limiting. (See id. at 539.)

Similarly, the only support Turner offers for experiencing forgetfulness and severe drowsiness is her own testimony, which the ALJ found to be less than credible. For evidence of forgetfulness, Turner cites to her own statement that she sometimes needs a reminder to go places, which fails to indicate significant memory impairment. (See id. at 248.) She claims that she has to lie down for several hours

a day because of fatigue, but there is no other evidence to corroborate her allegations. (See id. at 66.) Absent additional evidence of Turner's alleged side effects or some evidence that they are functionally impairing, the court finds the ALJ sufficiently supported his decision not to incorporate these side effects into her RFC determination.

## C. Credibility Analysis

Turner argues that in addition to using "boilerplate" language, the ALJ erred by finding her not credible because she worked at her sister's popcorn shop from May 2006 to July 2009. (See R. 20, Pl.'s Mem. at 10-11.) Turner has a particularly high hurdle to overcome in challenging the ALJ's credibility determination because this court may only overturn an ALJ's credibility assessment if it is "patently wrong." *See Skarbek*, 390 F.3d at 504-05. This court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and Turner "must do more than point to a different conclusion that the ALJ could have reached." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Put simply, this court will not disturb the ALJ's credibility determination unless it is "unreasonable or unsupported." *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The court finds that the ALJ adequately supported his credibility determination. Turner argues that the ALJ failed to differentiate between "being able to work a few hours a week and having the capacity to work full time." (R. 20, Pl.'s Mem. at 10 (quoting *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) (internal quotations omitted)).) But as the ALJ pointed out, Turner indicated in a

January 2010 work history report that she worked at the popcorn store eight hours a day, seven days a week. (A.R. 43, 232, 238.) She also testified at the May 2011 hearing that she worked there five days a week. (Id. at 59.) The ALJ thus had ample reason to conclude that Turner worked at the popcorn shop full-time.

The court also agrees with the Commissioner that in considering Turner's work history, the ALJ did not simply equate Turner's past ability to work with a present ability to work. (See R. 25, Def.'s Mem. at 6.) Rather, the ALJ found the nature of her job at the popcorn shop inconsistent with her alleged limitations. (A.R. 43.) For example, the ALJ pointed out that Turner testified she could not cook, and yet she was able to stand for eight hours a day while working at her sister's shop. (Id. at 238.) Turner also reported that her job included lifting, carrying, and packing boxes. (Id.) Both times she applied for benefits, Turner alleged disability since September 2007, but she was able to work full-time until July 2009 when the popcorn shop went out of business. (See id. at 43, 59.)

The ALJ provided numerous other reasons for finding Turner less than credible. For example, he noted that at first she said she last worked in 2005, but then testified that she worked at the popcorn shop after 2005. (Id. at 43, 58-59.) Turner testified to having emergency room-level pain on a typical day and going to the emergency room every other week, but the record does not support her testimony. (Id. at 44, 60.) At her March 2010 consultative examination Turner reported "doing well" until she "started to have severe pain in her low back area" in October 2009, which was well after her alleged disability onset date of September

2007.  (Id. at 43-44, 563.)  Turner testified that she attended about a month of physical therapy four months prior to the hearing, but there is no record of this therapy.  (Id. at 44, 64.)  The court finds it was not patently wrong for the ALJ to find that inconsistencies between Turner's statements and the record detracted from her credibility.  *See Skarbek*, 390 F.3d at 504-05; *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010).

Furthermore, the ALJ made reference to Turner's demeanor during the hearing.  The Seventh Circuit has acknowledged that scrutinizing a claimant's conduct is problematic because the claimant might manipulate her demeanor to display discomfort.  *See Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000).  Nonetheless, it has "repeatedly endorsed the role of observation in determining credibility."  *Id.* (collecting cases).  Here, the ALJ observed that Turner "was able to participate in the hearing without any overt pain behavior," and that she did not appear distracted.  (A.R. 45.)  The court affords his subjective assessment substantial deference because it is based on the kind of intangible elements that only the ALJ is in a position to observe.  *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999); *see also Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).

The ALJ did, however, make some errors in other parts of his credibility assessment.  For example, the ALJ mischaracterized Turner's testimony when he discredited her because she "goes to the grocery store" and said she "washed dishes."  (A.R. 43, 45.)  But Turner actually testified that she sits in the car whenever she and her sister go to the grocery store, and that although she tries to

wash dishes, she cannot bend or lift much.  (Id. at 63-64, 66-67.)  The ALJ also said that Turner did not renew her driver's license "because she had unpaid toll tickets," (id. at 45), but her testimony indicates that the primary reason she no longer drives is because of her "sickness," (id. at 68).

The ALJ also wrote that Turner reported having to "brace herself with a wall or nightstand, but she was ambulatory on many examinations."  (Id. at 44.)  Turner actually reported that she has to brace herself when getting out of bed in the morning.  (See id. at 244.)  The ALJ pointed out that Turner said she used a cane and "there is no evidence that a cane has been prescribed."  (Id. at 44.)  But canes do not require a prescription, so whether a doctor prescribes a cane is not probative of whether a claimant needs to use one in the first place.  *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (characterizing as "absurd" an ALJ's suspicion stemming from claimant's use of cane without prescription).

Despite these missteps, the ALJ's other conclusions regarding Turner's credibility were reasonable and sufficiently supported.  *See Getch*, 539 F.3d at 483.  "Not all of the ALJ's reasons must be valid as long as enough of them are."  *Halsell v. Astrue*, 357 F. Appx. 717, 722-23 (7th Cir. 2009)).  But even though this court finds that the ALJ's credibility assessment is not a basis for remand, remand is still necessary to address the ALJ's inadequate listing analysis and the other concerns identified above.

## Conclusion

For the foregoing reasons, Turner's motion for summary judgment is granted, the Commissioner's is denied, and the case is remanded for further proceedings consistent with this opinion.

**ENTER:**


Young B. Kim
**United States Magistrate Judge**